ROBERTSON, Justice.
The Mississippi State Tax Commission, appellee, imposed, levied, and assessed a privilege license tax under “the Emergency Amusement Revenue Act of 1934,” as amended, against the Back-Acres Country Club, Inc., appellant. The Circuit Court of Tate County affirmed the order of the Commission, and the appellant prosecutes this appeal.
The appellant contends that the mere fact that it provides and maintains an 18-hole golf course and a swimming pool for the exclusive use of its resident members and their guests, and its nonresident members, does not bring it within the provisions of Sections 9056 and 9057 Mississippi Code 1942 Annotated (Supp.1966). The appellant assesses and collects from a resident member a $3.00 greens fee for each invited guest using the golf course, and 500 for each guest using the swimming pool. The club also charges each nonresident member $3.00 for each day that the nonresident member actually uses the golf course and 50^ per day for the use of the swimming pool. The appellant argues that these assessments against its resident and nonresident members do not constitute admission charges obtained “from the general public or a limited or selected number thereof” to an amusement as defined in Section 9056.
Back-Acres Country Club, Inc. is a nonprofit, nonshare corporation, organized under Mississippi law and domiciled in Senatobia, Mississippi. According to its charter the principal purpose for which the club was organized was to provide a golf course, swimming pool, clubhouse, tennis courts and other recreational facilities for the enjoyment of the club. The use of these facilities is restricted by its constitution to the several classes of members.
The bylaws extend the use of all of its facilities to three classes of members: life, resident and nonresident. The resident members must reside in Tate County, the *533 south half of DeSoto County, or the north half of Panola County. The nonresident members are restricted to individuals living outside of the area for resident members.
A resident member may invite as his guest, with the permission of the board of directors, one living within the resident membership area provided such guest is a potential member. Such a guest may not be invited on more than two occasions. Resident members may also invite as their guests individuals who do not reside within the resident membership area, but this invitation is limited to two times in each twelve-month period. Nonresident members may not invite guests at any time.
The facilities of the club are not available to the general public, or any limited or selected group therefrom, but are restricted to its membership in good standing and to guests of resident members, as defined and limited in its bylaws. All members are required to register in a book provided for that purpose on the premises and are required to identify their guests, and members must be prepared at all times to show their membership cards as authority for the use of the club’s facilities.
Resident members pay a fixed monthly charge as dues, in addition to the special assessment for each invited guest. The special charges are billed to the resident member and not to his guest. A nonresident member pays an annual membership fee of $1.00 and is assessed for his actual use of the golf course and swimming pool as heretofore mentioned. He is not charged for the use of the clubhouse or any other facilities of the club, including five fishing lakes on the club property.
Before becoming either a resident or nonresident member, one must submit a written application for membership. Each applicant must be sponsored by a member, and the name of each applicant is posted on the club bulletin board for a certain period of time. If no objections are received, then the application is passed on to a secret membership committee. If that committee approves and the board of directors approves, the applicant is admitted to membership upon the payment of the initiation fee and any other fees prescribed for membership. A membership card is then issued and the member must be prepared to exhibit the membership card at any time.
No member may receive any dividend or any pecuniary benefit from the club. Any such benefit is prohibited in the charter itself and also by the law under which the club was organized. No officer of the club receives any salary, and the maintenance of the golf course is the major part of the club’s operating budget. The extent to which the golf course and swimming pool are used by its members largely determines the overall annual cost of upkeep.
Mr. Dick Ramsey Thomas, a former president, in describing the appellant club, testified:
“My neighbor gave the land for the Club. We have worked hard and we have helped to try to build that Club up. Many of us have given time and money. We take our families out there, we are proud of it. A country club doesn’t pretend to be a democratic organization. It is exclusive by nature, and we have done everything within our power to protect that exclusive right. We pay for the privilege of being exclusive owners and users of our facilities, and we do not want and will not permit the general public to come upon our grounds.”
Was it the purpose of the Legislature for the State Tax Commission to impose, levy and assess a privilege license tax on a private country club operating a golf course and swimming pool for the exclusive use of its members and their invited guests because the club specially assessed each resident member for the use of these facilities by his invited guests and specially assessed a nonresident member for each day of actual use of the golf course or swimming pool? We think not. Are these *534 assessments made against its members in reality a method “of obtaining admission charges, donations, contributions, or monetary charges of any character from the general public or a limited or selected number thereof, directly or indirectly”? We think not.
Section 9056 Mississippi Code 1942 Annotated (Supp.1966) defines “amusement” subject to the tax in this way:
“When the term ‘amusement’ is used in this Act, it shall mean and it shall include all manner and forms of entertainment and amusement, theatres, opera houses, moving picture shows, aquariums wherein are displayed aquatic life, vaudeville, amusement parks, athletic contests, including wrestling matches, prize fights, boxing exhibitions, football and baseball games, skating rinks, race tracks, golf courses, public bathing places, public dance halls of every kind and description, and all forms of diversion, sport, recreation, or pastime, shows, exhibitions, contests, displays, games, or any other and all methods of obtaining admission charges, donations, contributions or monetary charges of any character, from the general public or a limited or selected number thereof, directly or indirectly in return for other than tangible property or specific personal or professional services.”
This definition remained as originally enacted in “the Emergency Amusement Revenue Act of 1934” until 1962, when the Legislature added “aquariums wherein are displayed aquatic life,” to cover marine-lands operated for profit and open to the general public upon the payment of an admission fee.
We think the intent and purpose of the Legislature becomes crystal clear when we examine the juxta position of “golf courses” in the statute. The proper way to determine the real intent of the Legislature is to study the words used by it in context.
In Section 9056 the term “golf courses” is preceded by “football and baseball games, skating rinks, race tracks,” and is followed by the words “public bathing places, public dance halls of every kind and description.” The average citizen would immediately reach the conclusion that what the Legislature was talking about, when it used the term “golf courses” and surrounded it with sports and places generally recognized as open to the public upon the payment of an admission charge, was golf courses operated for profit or by municipalities which all members of the public may use upon the payment of an admission charge.
The Legislature also used this language in Section 9056:
“[0]r any other and all methods of obtaining admission charges, donations, contributions or monetary charges of any character, from the general public or a limited or selected number thereof, * * (Emphasis added).
We find in 35 Words and Phrases (perm. ed. 1963) on page 27 these definitions of the word “public”:
“The ‘public’ is defined as of, belonging to, or concerning the people as a whole; of the community at large. State v. Christine, 118 So.2d 403, 405, 239 La. 259.
“ ‘Public’ means the general body of man kind, or of a nation, state or community, the people, indefinitely; as the American public. Hiner v. Wenger, 91 S.E.2d 637, 641, 197 Va. 869.
* i|í * >¡í *
“ ‘Public’ means of or pertaining to the people; relating to or affecting a nation, state, or community at large. People v. Powell, 274 N.W. 372, 373, 280 Mich. 699, 111 A.L.R. 721.”
“A limited or selected number” of the general public, as the term is used in Section 9056, means limited to a particular sex, limited because of seating capacity, limited to adults, or limited to children. *535 It is an ominous sign of the times that the advertisements of many movies limit the viewers to those over 17 years of age.
Further light is shed on the intent of the Legislature by this language from Section 9057 Mississippi Code 1942 Annotated (Supp.1966):
“There is hereby imposed, levied and assessed, to be collected and paid as hereinafter provided, a privilege license tax of One Cent (1^) for each Ten Cents (10^) or fractional part thereof received as admission to any amusements as here-inbefore defined, upon every person conducting such amusement or place where such amusement is conducted * * (Emphasis added).
This language would indicate that what the Legislature had in mind was sports and amusements operated as businesses for profit.
Construing all the language of Sections 9056 and 9057 together, including the alternative methods of computing the tax contained in Section 9057, it is our opinion that the Legislature did not intend to levy an ^amusement tax on a private country club because it maintains a golf course and a swimming pool for the exclusive use of its members and their invited guests, and in order to defray the actual expenses of maintaining its golf course and swimming pool the club specially assesses each resident member for his invited guest and specially assesses each nonresident member for each day that such member actually uses the golf course or swimming pool.
We have been unable to find any case holding that a private country club must charge fixed monthly dues to all classes of members rather than base dues on a graduated scale according to the actual use of a golf course or swimming pool, in order to avoid taxation as the operator of a sport or amusement.
The judgment of the lower court is therefore reversed, and judgment rendered here for the appellant.
Judgment reversed and judgment rendered here for appellant.
GILLESPIE, P. J., and RODGERS, PATTERSON, and INZER, JJ., concur.